## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No.     14 CR 155 - 1 |
| v. | ) |
| | ) Judge Amy J. St. Eve |
| TOBY JONES | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendant Toby Jones has moved to suppress KB's eyewitness identification of Toby Jones on the grounds that it violates his Fifth Amendment right to Due Process under the United States Constitution. For the reasons stated below, the Court denies his motion.

## BACKGROUND

On March 31, 2015, a grand jury returned a fourteen count Second Superseding Indictment (the "Indictment") against Defendant Kelsey Jones and co-defendant Toby Jones. The Indictment charges Defendant Toby Jones in twelve of the fourteen counts. Specifically, Count One charges Defendant Toby Jones with conspiring with Kelsey Jones and others to intentionally possess with the intent to distribute and to distribute a controlled substance, in violation of 21 U.S.C. § 846. Count Two charges Defendant with knowingly and intentionally distributing a controlled substance on or about December 17, 2013. Count Three charges Defendant Toby Jones with on or about December 30, 2013, knowingly and intentionally distributing a controlled substance. Count Four charges him with knowingly and intentionally distributing a controlled substance on or about January 15, 2014. Similarly, Count Five charges Defendant with knowingly and intentionally distributing a controlled substance on or about February 4, 2014. Count Six charges that on or about February 25, 2014, Defendant knowingly

and intentionally distributed a controlled substance. Count Seven charges Defendant, along with co-defendant Kelsey Jones, with knowingly and intentionally distributing cocaine base, on or about March 19, 2014. Count Eight charges Defendant Toby Jones with on or about March 25, 2014, knowingly and intentionally distributing a controlled substance.

Count Nine of the Indictment charges Defendant Toby Jones with knowingly possessing a firearm in furtherance of a drug trafficking crime as charged in Count Eight of the Indictment. Count Ten charges Defendant and his co-defendant Kelsey Jones with conspiring to kill and attempt to kill a person, and to knowingly engage in conducting to cause bodily injury to another person, with the intent to retaliate against any person for providing information to a law enforcement officer regarding the commission and possible commission of a federal offense. Count Eleven charges Defendant with attempting to kill another person with intent to retaliate against a person for providing a law enforcement officer with information related to the commission and possible commission of a federal offense. Finally, Count Twelve charges Defendant with knowingly using a firearm during and in relation to a crime of violence, namely the conspiracy with the intent to murder a federal informant with intent to retaliate, as charged in Count Ten, and the attempted murder of a federal informant with intent to retaliate, as charged in Count Eleven. The Indictment also contains a forfeiture allegation against Defendant Toby Jones and his co-defendant Kelsey Jones.

## ANALYSIS

Defendant asks the Court to suppress the eyewitness identification of Defendant Toby Jones by KB as the man who shot him on March 27, 2014, on the grounds that the government's procedures unnecessarily suggested his identification thereby violating his due process rights. KB is the victim of the crime charged in Count Eleven of the Indictment. On September 15,

2015, the Court held a hearing[1] on the motion. During the hearing, Defendant called the following witnesses to testify: Oak Park Police Detective T. Unzicker, ATF Special Agent Chris Labno, ATF Special Agent Tony Heiserman, and KB. The government called retired Oak Park Police Detective Robert Taylor to testify at the hearing. In addition, the parties entered stipulations as to the testimony of Oak Park Police Officer P. Baudo and Detective James Sperandio. The Court carefully assessed the testimony and demeanor of each witness during the hearing and makes its factual findings below.

I.    **Legal Standard**

Defendants have a due process right not to be subject to unreasonably suggestive identification procedures that create a "substantial likelihood of irreparable misidentification." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972) (citation and internal quotation marks omitted). "[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire,* 132 S. Ct. 716, 724, 181 L. Ed. 2d 694 (2012) (citations omitted). "Even when the police use such a procedure, ... suppression of the resulting identification is not the inevitable consequence." *Id.* Courts should suppress the identification only when there is "a very substantial likelihood of *irreparable* misidentification." *Id.* (citations and quotations omitted). An irreparable misidentification exists when "the procedures of trial would not suffice to allow jurors to separate reliable from mistaken identifications." *United States v. Johnson*, 745 F.3d 227, 229 (7th Cir. 2014).

---

[1] A suppression hearing is warranted only when the defendant presents a disputed issue of material fact that will affect the outcome of the motion. *See United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011). The government here conceded that a limited hearing was necessary given that "key moments in the identification procedure were not well documented by law enforcement." (R. 174, Response at 10.)

The Seventh Circuit has adopted a two-prong approach to determine whether identification procedures have risen to a constitutional violation. First, courts consider whether the identification procedure that law enforcement used was "both suggestive and unnecessary." *United States v. Sanders*, 708 F.3d 976, 983-84 (7th Cir.) *cert. denied*, 134 S. Ct. 803, 187 L. Ed. 2d 608 (2013), citing *Perry*, 132 S. Ct. at 724. Second, courts look to the "totality of the circumstances" to determine whether other indicia of reliability "outweigh[ ] ... the corrupting effect of law enforcement suggestion." *Id*., citing *Perry,* 132 S.Ct. at 725. Courts only look to the second prong if the defendant establishes the first prong. *See Perry*, 132 S.Ct. at 730.

In order to establish that the identification procedure was both suggestive and unnecessary under the first prong, "the situation must have involved 'improper state conduct'— one in which the circumstances did not justify law enforcement's suggestive behavior." *Sanders*, 708 F.3d at 984. This prong "focuses on police conduct—its suggestiveness and necessity in the specific situation at hand." *Id.*

## II. The Shootings and Subsequent Investigation

Some of the charges in the Indictment pertain to two separate shootings at 454 North Austin Blvd. in Oak Park, Illinois – one on March 27, 2014 and one on April 2, 2014. Defendant is charged in connection with the March 27, 2014 shooting and as part of a conspiracy containing both shootings as acts in furtherance of the conspiracy. In addition, Defendant is charged with knowingly using a firearm in relation to the conspiracy to murder a federal informant. KB, the victim of the March 27 shooting, subsequently identified Defendant as the shooter in a photo lineup. Defendant seeks to suppress KB's identification on the grounds that it violates his Due Process rights under the Constitution.

### A. Shooting of KB on March 27, 2014

On March 27, 2014, shortly after midnight, KB was shot in his apartment located on the second floor of 464 North Austin Blvd. in Oak Park, Illinois. KB had returned to the apartment after being out with his dad and some friends where he had consumed a couple of beers and smoked two blunts of marijuana. KB heard a knock on his front door and went to answer it. When he asked who it was, a male voice responded that he knew who it was. (Transcript of Hearing ("Tr.") at 67.) KB looked out the peephole of his apartment door, but he could not see anyone because someone's finger was blocking the peephole. (Tr. at 68.) The person then removed his finger from the peephole and KB saw two African American males standing in the hallway. KB did not recognize the individuals. The man who eventually shot him was standing directly in front of KB's apartment door. (*Id.*) He started pounding on the door and yelled, "It's me, open the fucking door." (Def. Ex. 2, Grand Jury Statement at 8.) KB told him "Wrong door." (*Id.*) The individual started to kick the door at that point and then reached toward his waistband. KB heard a shot fired and felt a pain in his right thigh. When KB turned to run from the door, he heard two additional shots fired.

The Oak Park Police thereafter responded to the shooting, and KB was taken to Loyola Medical Center in Chicago for a gunshot wound to his right thigh. At approximately, 2:10 am on March 27, 2014, Oak Park Police Detectives Unzicker and Taylor and Officer Paul Baudo interviewed KB at Loyola Medical Center where he went to receive treatment. KB, who was in a hospital bed, was in pain, but coherent, according to Detective Unzicker. Detective Unzicker also testified that he believed KB had received some medication, but he did not know what or how much. KB described his shooter to the Detectives as "a male black, dark complexion, clean shaven, 27, 28 years old. Said he didn't know how tall he was, but that he had a muscular build."

(Tr. at 7.) His testimony was consistent with his report of the interview. In addition, Officer Baudo's stipulated testimony reflected the same description by KB on March 27 – "a muscular dark skinned black male, approximately 27 to 28 years of age…." (R. 213, Stipulation as to Officer Paul Baudo's Testimony.) Detective Taylor also corroborated this description. KB, however, testified that he did not give the officers any information at the hospital and told them that he did not see anyone. KB said that he was not cooperative that night. (Tr. at 65.) He subsequently said that he was not sure if he gave them a description of the shooter when they interviewed him at the hospital. KB then testified that he did not give them a description. He admitted, however, that he had received medication at the hospital that made him drowsy. (*Id.* at 105.)

Detective Taylor interviewed KB again on March 28, 2014. During this interview, KB gave a different description of the shooter. Specifically, he said the shooter was light-skinned, not dark-skinned. (*Id.* at 110-11.) He further told the Detective that the shooter was clean shaven. (*Id.*) In addition, KB told Detective Taylor that he did not want to get involved in the situation, did not want to go to court, did not want to testify and did not want to identify anyone. KB said he wanted to move on and put the incident behind him. (*Id.*)

### B. Shooting of CI on April 2, 2014

On April 2, 2014, an ATF confidential informant ("CI") was shot in the parking lot behind 464 North Austin Blvd. This address is the same building where Individual A shot KB six days earlier. CI lived in a residential apartment unit on the third floor of 464 North Austin Blvd. The CI had been cooperating with law enforcement and had participated in an undercover narcotics and firearms investigation that gave rise to several of the charges in this case. The

6

description of the shooter fit the general description of the shooter in the March 27, 2014 incident. (Tr. at 128.)

      **C.**      **KB's Meeting with Detective Robert Taylor**

Shortly after the April 2, 2014 shooting, KB went to the Oak Park police station and met with Detective Taylor. Prior to the meeting, Detective Taylor put together two color photo lineups based on information and names he obtained from the ATF. (Gov. Ex. Taylor 1 & Taylor 2.) One of the lineups contained Toby Jones' photograph (Gov. Ex. Taylor 1) and the other one contained Kelsey Jones' photograph. (Gov. Ex. Taylor 2.) Detective Taylor contacted KB after he had this information and asked him if he would come to the station.

Detective Taylor showed Defendant the photo lineups. Detective Taylor credibly testified that KB viewed the photo lineup, looked left to right, and "kind of paused at photo No. 3." (Tr. at 114.) KB told Detective Taylor that he did not recognize anyone. He then viewed the second photo lineup and again said that he did not recognize anyone. (*Id*.) When he looked at the second photo lineup that included Kelsey Jones' photograph, "there was no hesitation or pausing at all." *Id.* at 114. Detective Taylor then told KB they were going to close the case.

KB testified that he viewed the lineups and told the Detectives that he did not recognize anyone. He testified that he lied to the Detectives because he did recognize the shooter depicted in the third photograph. He lied to them "because at that time when I was being sat down by those Oak Park officers again, I didn't want nothing to do with what was going on. I had just got shot. I had a son on the way that I was going back and forth to my baby's mother about and I just wanted to be left alone, you know. And at that time, like I told them, I didn't know nothing, I didn't see nothing, I just wanted to be left alone." (*Id.* at 75.)

### D.    KB's June 2, 2014 Post-Arrest Statement

Special Agent Labno interviewed KB on June 2, 2014 at the ATF offices in Chicago after arresting him pursuant to a warrant for selling crack cocaine. KB admitted his own criminal conduct and told the ATF agents that he wanted to cooperate with them. KB agreed to cooperate. The agents then asked him about the March 27, 2014 shooting. KB confirmed that he had gone to the Oak Park Police station to view a photo lineup shortly after he was shot on March 27, 2014. KB confirmed that he had seen the shooter depicted in the lineup that the Oak Park police showed him on March 27, 2014, and that he stared at him. He confirmed that it was Toby Jones. When the ATF agents asked KB why he did not identify his shooter at the meeting, he responded "I live by a different code." KB explained "I don't snitch. People on the street don't snitch. They take care of stuff." (Tr. at 33.) KB thereafter agreed to view photographs and truthfully identify his shooter.

KB described the individual who shot him for Agent Labno. His description closely matched Defendant Toby Jones. Specifically, KB told Agent Labno before he showed KB any photographs that the man who shot him was a stocky, light-skinned African American male with a distinctive beard.

At this point, Agent Labno went to get the two color lineups he had. (Gov. Ex. Taylor 1 and Gov. Ex. Taylor 2.) He explained that ATF did not have a color copier so he went to a database which permitted him to print out arrest photographs in color. He printed individual, large scale format pictures of each of the six individuals in the photo lineup. Agent Labno credibly explained that he intended to place the six individual photographs on the table in front of KB in the same order the photo lineup displayed them. He further explained that he did not show KB the color photo lineup because "I thought I did better than that by showing him the

larger format pictures of the same people who were in the lineup in a photo spread format." (Tr. at 54.) Agent Labno did not want to create a photo lineup different than the one the Oak Park Police showed him because "the commonality between the two photo spreads that he would have seen would have just been the defendant. So, it would have unnecessarily or unduly affected his identification…." (*Id.* at 58.) He also made a black and white copy of the photo lineup that KB previously had viewed at the Oak Park Police Station.

Agent Labno testified that he carried the six photographs back into the room with him in the order they appeared in the lineup. Agent Labno explained that the top three photographs were more predominant than the last three. (*Id.* at 41.) When Agent Labno walked back into the room, he said that KB identified Toby Jones' photograph as the man who shot him on March 27, 2014 before Agent Labno had the opportunity to place the individual photographs on the table. Specifically, KB told Agent Labno "there's his gay ass right there." (*Id.* at 44.) Agent Labno acknowledged that he could have done a better job with the procedure and suggested that he should not have had the individual photographs visible to KB when he walked into the room. Given this, Agent Labno testified that he thereafter "backed it up" and placed the six individual photographs on the table in the same order as the photo lineup. (*Id.* at 44.) He told KB to look at the photos and see if he could recognize the shooter and "there might be someone in there and there might not be someone in here." (*Id.*) KB again picked out Defendant Toby Jones as the shooter. He thereafter initialed and dated the photograph. (Gov. Ex. Toby 1.) Agent Labno testified that he then showed KB the original black and white photo lineup that Detective Taylor had shown him at the Oak Park Police Station. KB circled the number "3" below Defendant Toby Jones' picture. (Gov. Ex. Toby 1). These details of the identification are not contained in Agent Labno's report.

9

KB remembered that he saw more than one picture, but he could not remember how many. (Tr. at 87.) He saw Defendant's picture, and told Agent Labno that it was "his gay ass". (Tr. at 107.) KB confirmed that the other pictures included pictures of light-skinned African Americans and individuals with beards.

E.  **Grand Jury**

On June 17, 2014, KB appeared to testify before the grand jury pursuant to a subpoena. Prior to his grand jury appearance, KB told ATF Special Agent Heiserman that he was no longer certain that the individual whom he previously had identified as his shooter on March 27, 2014 was in fact the shooter. KB told Agent Heiserman that the individual who he previously identified resembled the shooter in a number of ways, but he could say with only about "40 percent" certainty that it was actually the same person. (Tr. at 93, 98.) He further stated that he had identified Defendant's picture during his June 2, 2014 post-arrest interview because it was the one picture the ATF agents had shown him, and because he recognized it as one of the photographs in the photo lineup he had previously viewed during his interview with the Detective from the Oak Park Police Department. During the interview, KB described the shooter as "a black male with a bigger build and a beard." (Tr. at 18.) He did not describe his complexion. KB did not testify before the grand jury on June 17, 2014.

During the hearing, KB testified that he lied to Agent Heiserman when he met with him on June 17, 2014. (*Id.* at 93.) KB credibly testified that: "I wasn't 40 percent sure. I was a hundred percent sure." (*Id.*)

The government subsequently subpoenaed KB to appear before the grand jury. On March 3, 2015, KB met with the government before testifying before the grand jury. During the meeting, KB told law enforcement that he had not told them the truth on June 17, 2014 when he

10

said he was uncertain about his June 2, 2014 identification of the man who had shot him. In fact, KB said he was, and always had been, certain of the man who had shot him on March 27, 2014. KB said he changed his statement because he did not want to endanger himself or his family and did not want to get involved in the situation. In addition, KB explained that when he went to the Oak Park Police Station to view the photo lineup, he stared at the photograph of his shooter but did not identify him. KB reaffirmed that when the agents showed him the lineup on June 2, 2014 and he circled photograph 3 as the person who shot him, he was truthfully identifying his shooter. KB then testified before the grand jury.

KB told the grand jury that when he went to the Oak Park Police Department to view the photo lineups, he recognized the shooter in the photo lineup and stared at his photo. He nonetheless did not disclose this identification to the Detective because he "did not want to get involved in the investigation. (Def. Ex. 2, KB Grand Jury Statement at 9.) He further testified that he had told Agent Labno the truth on June 2, 2014, when he met with him and identified Defendant as the shooter. (*Id.* at 10.) He also identified Defendant on the photo lineup for the grand jury. KB then testified regarding his June 17, 2014 meeting with Agent Heiserman:

> I told AUSA and the agent, that after thinking more about the events of March 27th, I was no longer certain I could positively identify my shooter. Specifically, I told the AUSA and the agent that the man I had previously identified as my shooter resembled the actual shooter in several ways, but I could not say with only about 40 percent certainty that he was the actual shooter. This was not true -- in fact, I was still 100 percent certain that the man I had identified as the shooter following my arrest on June 2nd was the actual shooter.

(*Id.* at 13.) KB explained to the grand jury that he had lied to Agent Heiserman because he did not want to endanger himself or his family, and he did not want to get further involved in the situation. (*Id.* at 14.)

11

**III. Law Enforcement Did not Use Any Suggestive and Unnecessary Procedures**

The Court turns to the first prong of the test -- whether the identification procedure that law enforcement used was "both suggestive and unnecessary." Defendant challenges the photo lineup shown to Defendant initially on March 28, 2014 as unnecessarily suggestive. Viewing that photo lineup, the Court disagrees. All six photographs depict African-American men. One of the photos (#2) depicts a darker-skinned man. While the other five have lighter skin, it is true that they nonetheless have different skin coloration. As the Seventh Circuit has observed, however, different skin coloration "is inevitable in any array or sequence of photos—just as it is inevitable that the facial hair, ear sizes, and chin shapes will not be identical. A 'lineup of clones is not required.'" *Johnson*, 745 F.3d at 230, citing *United States v. Arrington,* 159 F.3d 1069, 1073 (7th Cir. 1998). Moreover, "it's impossible to find photos of persons who are identical to a suspect ... and also undesirable, because then the witness wouldn't be able to identify the suspect." *Id.*, citing *United States v. Ford,* 683 F.3d 761, 766 (7th Cir. 2012). In addition, at least five of the men have some facial hair. The men all appear to be in the same general age range and the same build. The photo lineup does not make Defendant's photograph stand out, and thus it was not suggestive.

In addition, the Oak Park Police Department created the photo lineup before KB gave an accurate description of Defendant that matches how Defendant appears in the photo lineup. The credible and consistent testimony of Detective Unzicker and Detective Taylor was that KB described his shooter on the day of the shooting as a black male with a *dark* complexion, who was clean shaven and about 27 or 28 years old. Officer Baudo's stipulated testimony reflected the same description by KB on March 27 – "a muscular dark skinned black male, approximately 27 to 28 years of age…." Although KB told Detective Taylor on March 28 that the shooter was

light-skinned, he said he was clean shaven. Given that the law enforcement officers did not have an accurate description of the shooter until after the Oak Park Police officers designed the photo lineup, Defendant cannot successfully claim that they created the lineup based on the description.

Furthermore, Defendant has not identified anything suggestive in the procedures utilized by Detective Taylor on March 28, 2014. Detective Taylor credibly testified that he gave KB the color photo lineup, KB viewed the photo lineup, looked left to right, and "kind of paused at photo No. 3," Defendant's photograph. He then told Detective Taylor that he did not recognize anyone. KB corroborated that he paused at Defendant's photograph because he recognized him as the shooter. He did not want to get involved, however, so he denied any recognition.

While Detective Taylor did not write a report regarding this meeting with KB, the absence of a report does not amount to a due process violation. Defendant is free to cross examine Detective Taylor on this fact.

Defendant also argues that the procedures employed by Agent Labno on June 2, 2014 were unnecessarily suggestive. As an initial matter, the Court credits Agent Labno's testimony regarding the procedure. He did not simply show KB a single photograph of Defendant. Instead, Agent Labno walked into the room where KB was waiting with all six individual photographs in his hand. The top three photographs (photographs 1-3 in the photo lineup) were more prevalent than the others. Before Agent Labno had the opportunity to place the photographs on the table in the same order they appeared in the lineup, KB immediately recognized the photograph of Toby Jones as the man who shot him on March 27, 2014. Both Agent Labno and KB consistently and credibly testified that KB told him words to the effect of "there's his gay ass right there." Realizing that this procedure was not ideal, Agent Labno then placed the six individual photographs on the table in the same order as the photo lineup. He told

KB to look at the photos and see if he could recognize the shooter and "there might be someone in there and there might not be someone in here." KB again picked out Defendant Toby Jones as the shooter. The Court finds that this identification procedure was not unreasonably suggestive. The Court's ruling is further bolstered by the fact that KB previously saw the photo lineup at the Oak Park Police Station on March 28, 2014 and recognized Defendant as the shooter at that time. The Court agrees with Defendant that Agent Labno could have used a better procedure, but the process he employed does not equate with a due process violation.

As Defendant points out, Agent Labno's report does not contain any information about him showing KB the six individual photographs from the photo lineup. Again, the failure to write a report may provide effective cross examination material, but it does not amount to a due process violation.

Because Defendant has failed to establish the first prong, namely, that law enforcement officers orchestrated suggestive and unnecessary identification procedures, the Court need not address the second prong of the test. The inconsistencies in KB's statements to law enforcement go to the reliability of his statements. This issue is one for the jury. *See Perry*, 132 S. Ct. at 721 ("[W]hen no improper law enforcement activity is involved, … it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, … vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt."). There simply is not "a very substantial likelihood of *irreparable* misidentification" in this case. Accordingly, the Court denies Defendant's motion to suppress the witness identification by KB.

## CONCLUSION

For the reasons discussed above, the Court denies Defendant's motion.

Dated: September 24, 2015

                                                  AMY J. ST. EVE
                                                  United States District Court Judge