# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 14 CR 155-1 |
| v. | ) | |
| | ) | Hon. Amy J. St. Eve |
| TOBY JONES | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendant Toby Jones has moved for a judgment of acquittal or, in the alternative, a new trial on Counts Nine through Twelve of the Indictment [323]. For the following reasons, the Court denies Defendant's motion.

## BACKGROUND

On September 17, 2015, a grand jury returned a fifteen-count Third Superseding Indictment (the "Indictment") against Defendant and his co-defendants, Kelsey Jones and Mario Whitfield. (R. 216, the Indictment.) The Indictment charged Defendant, also known as "Big Red," "Slick," and "Smitty," in twelve of the fifteen counts. Defendant pled guilty to Counts One through Seven of the Indictment.[1] (R. 263, 264.) Defendant pled not guilty, however, to Counts Eight through Twelve. Count Eight charged Defendant with knowingly and intentionally distributing cocaine base on or about March 26, 2014. Count Nine charged him with knowingly

---

[1] Count One charged Defendant with conspiring with his co-defendant, Kelsey Jones, and others to intentionally possess with the intent to distribute and to distribute a controlled substance, in violation of 21 U.S.C. § 846. Count Two charged Defendant with knowingly and intentionally distributing a controlled substance on or about December 17, 2013. Count Three charged Defendant with, on or about December 30, 2013, knowingly and intentionally distributing a controlled substance. Count Four charged him with knowingly and intentionally distributing a controlled substance on or about January 15, 2014. Similarly, Count Five charged Defendant with knowingly and intentionally distributing a controlled substance on or about February 4, 2014. Count Six charged Defendant with knowingly and intentionally distributing a controlled substance on or about February 25, 2014. Finally, Count Seven charged Defendant, along with co-defendant Kelsey Jones, with knowingly and intentionally distributing cocaine base, on or about March 19, 2014. (*See, generally,* R. 216, the Indictment.)

possessing a firearm in furtherance of a drug trafficking crime, as charged in Count Eight, in violation of 18 U.S.C. § 924(c).  Count Ten charged Defendant and Kelsey Jones with conspiring to kill and attempt to kill another person and to knowingly cause bodily injury to another person, with the intent to retaliate against any person for providing to a law enforcement officer information regarding the commission and possible commission of a federal offense, in violation of 18 U.S.C. § 1513.  Count Eleven charged Defendant with attempting to kill another person with the intent to retaliate against any person for providing to a law enforcement officer information related to the commission and possible commission of a federal offense, on March 27, 2014, in violation of 18 U.S.C. § 1513(a)(1)(B).  Finally, Count Twelve charged him with knowingly using a firearm during and in relation to a crime of violence, namely the conspiracy to murder a federal informant with the intent to retaliate, as charged in Count Ten, and the attempted murder of a federal informant with the intent to retaliate, as charged in Count Eleven, on March 27, 2014, in violation of 18 U.S.C. § 924(c).  (*See, generally*, R. 216, the Indictment.)

Defendant proceeded to a nearly two-week bench trial on Counts Eight through Twelve. During the trial, the government called the following witnesses: Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent Chris Labno, Wesley Fields, Jamie Ringswald, Mark Ringswald, Lemar "Marty" Smith, ATF Special Agent Joseph Waller, Chicago Police Department ("CPD") Officer Joseph Zaccagnino, Sprint Records Custodian Ray Clarke, Christy Miskell, ATF Special Agent Kevin Schuster, United States Secret Service ("SS") Special Agent Michael Saccomen, Robert Berk, Sidney McKamey, Tim Kucharski, Kim Hofsteadter, Kensha Barlow, and retired Oak Park Police Department Officer Robert Taylor.  Defendant did not call any witnesses and did not testify at trial.

The Court found Defendant guilty on Counts Eight through Twelve of the Indictment. (R. 317.)  Defendant now moves for a judgment of acquittal or new trial on Counts Nine through Twelve, pursuant to Federal Rules of Criminal Procedure 29 and 33, respectively.  (R. 332.)

**LEGAL STANDARD**

**I.      Motion for Judgment of Acquittal – Rule 29**

Federal Rule of Criminal Procedure Rule 29(a) provides that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).

"In challenging the sufficiency of the evidence, [a defendant] bears a heavy, indeed, nearly insurmountable, burden."  *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010); *see also United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015) ("We have referred to this standard as a nearly insurmountable hurdle[.]") (inner quotation marks omitted) (citation omitted); *United States v. Molton*, 743 F.3d 479, 483 (7th Cir. 2014); *United States v. Torres–Chavez*, 744 F.3d 988, 993 (7th Cir. 2014); *United States v. Jones*, 713 F.3d 336, 339-40 (7th Cir. 2013); *United States v. Berg,* 640 F.3d 239, 246 (7th Cir. 2011); *United States v. Dinga*, 609 F.3d 904, 907 (7th Cir. 2010); *United States v. Morris*, 576 F.3d 661, 665–66 (7th Cir. 2009). The reviewing court will view the "evidence in the light most favorable to the prosecution," and the defendant "'must convince' the court that, even in that light, 'no rational trier of fact could have found him guilty beyond a reasonable doubt.'"  *Id.* (quoting *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009)); *see also United States v. Eller*, 670 F.3d 762, 765 (7th Cir. 2012); *United States v. Dood*y, 600 F.3d 752, 754 (7th Cir. 2010) (stating that the inquiry is "whether evidence exists from which any rational trier of fact could have found the essential elements of a

crime beyond a reasonable doubt"). In other words, a court will "set aside a jury's guilty verdict only if 'the record contains no evidence, regardless of how it is weighed,' from which a jury could have returned a conviction." *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009) (quoting *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008)); *see also Warren*, 593 F.3d at 546. It follows that under Rule 29, courts "do not reassess the weight of the evidence or second-guess the trier of fact's credibility determinations." *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009); *see also United States v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009). This strict standard is recognition that "[s]orting the facts and inferences is a task for the jury." *Warren*, 593 F.3d at 547. Indeed, the Seventh Circuit teaches that:

> [t]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Moore*, 572 F.3d at 337 (quoting *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). The standard is no different when, as here, the Defendant is found guilty after a bench trial. *See Doody*, 600 F.3d at 754 ("We review a claim that a district court's verdict after a bench trial is unsupported by the evidence with the same deferential standard that applies to a jury verdict: we reverse only if, after viewing the evidence in the light most favorable to the government, we determine that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.") (citing *Arthur*, 582 F.3d at 716–17).

## II.     Motion for a New Trial – Rule 33

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of

justice so requires."  Fed. R. Crim. P. 33(a); *see also United States v. Berg*, 714 F.3d 490, 500

(7th Cir. 2013); *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012) (reviewing a district

court's order on a Rule 33 motion for abuse of discretion); *United States v. McGee*, 408 F.3d

966, 979 (7th Cir. 2005).  "'[C]ourts have interpreted [Rule 33] to require a new trial in the

interests of justice in a variety of situations in which the substantial rights of the defendant have

been jeopardized by errors or omissions during trial.'"  *United States v. Eberhart*, 388 F.3d 1043,

1048 (7th Cir. 2004) (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)),

*overruled on other grounds*, 546 U.S. 12, 126 S. Ct. 403, 163 L. Ed. 2d 14 (2005).

     "'A jury verdict in a criminal case is not to be overturned lightly,'" however, "'and

therefore a Rule 33 motion is not to be granted lightly.'"  *Eberhart*, 388 F.3d at 1048 (quoting

*United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)).  The court "may grant a new trial if

the jury's verdict is 'so contrary to the weight of the evidence that a new trial is required in the

interest of justice.'"  *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999) ("The focus

in a motion for a new trial is not on whether the testimony is so incredible that it should have

been excluded.  Rather, the court considers whether the verdict is against the manifest weight of

the evidence, taking into account the credibility of the witnesses."); *see also United States v.*

*Chambers*, 642 F.3d 588, 592 (7th Cir. 2011).  In other words, "[t]he court should grant a motion

for a new trial only if the evidence 'preponderate[s] heavily against the verdict, such that it

would be a miscarriage of justice to let the verdict stand.'"  *United States v. Swan*, 486 F.3d 260,

266 (7th Cir. 2007) (quoting *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989)); *see also*

*Presbitero*, 569 F.3d at 706.

**ANALYSIS**

I.    **Count Nine**

    A.    **Defendant's Drugs-for-Guns Exchange Violated 18 U.S.C. § 924(c) Under Seventh Circuit Law**

Defendant first argues that a "drug dealer who exchanges drugs for a firearm when the government is the seller of the firearm has not committed a criminal offense because the transaction has not 'furthered' the illicit drug market." (R. 332 at 2.) Instead, Defendant asserts, "[i]n a government sting setting where the defendant distributes a controlled substance to an undercover agent, the firearm is not actually possessed in furtherance of a drug trafficking offense because there is no *quid pro quo*. The government immediately recovers the firearm used to complete the sale[.]" (*Id.*) The Court interprets Defendant's argument to be two-fold: the government's involvement in this case precludes the Court from finding that Defendant 1) "possessed" the firearm given the swift arrest or 2) did so "in furtherance of" a drug trafficking crime given the sham nature of the sting-operation. The Court disagrees with both.

"[Section 924(c)] prescribes an increased penalty for 'any person . . . who, in furtherance of' a drug trafficking crime or crime of violence 'possesses a firearm.'" *United States v. Schmitt*, 770 F.3d 524, 539 (7th Cir. 2014) (citing 18 U.S.C. § 924(c)). Importantly, "'when a defendant receives a gun for drugs, he takes possession of the firearm in a way that furthers, advances, or helps forward the distribution of drugs.'" *Id.* 770 F.3d at 539 (quoting *Doody*, 600 F.3d at 755). Neither of Defendant's arguments convince the Court to hold otherwise.

First, regardless of the government's involvement in a drugs-for-guns exchange, defendants can violate § 924(c). In ruling that defendants violate § 924(c) when they receive firearms in exchange for drugs, the Seventh Circuit has not carved out scenarios in which the firearm dealer is an undercover government agent. Rather, the Seventh Circuit, in both *Doody*

6

and *Dickerson*, relied, in part, on a Tenth Circuit case in which the defendants were found guilty

despite the government's sting operation similar to the one at issue. *Doody*, 600 F.3d at 754–55

(citing *United States v. Luke-Sanchez*, 483 F.3d 73, 706 (10th Cir. 2007)); *see also United States

v. Dickerson*, 705 F.3d 683, 690 (7th Cir. 2013) (citing *Luke-Sanchez*, 483 F.3d at 706). Thus,

despite Defendant's argument to the contrary, the government's role in the drugs-for-guns

exchange did not preclude the Court from finding that Defendant possessed a firearm "in

furtherance of" a drug trafficking crime in violation of § 924(c).

Second, law enforcement's swift arrest and seizure of the firearm did not prevent

Defendant from taking "possession" of the firearm. Indeed, the simple act of accepting the

firearm into one's possession during a drugs-for-guns exchange fulfills both prongs of § 924(c).

*Dickerson* is instructive. There, the Seventh Circuit reasoned:

> There are sound policy reasons why Congress would want to apply enhanced
> penalties whenever guns and drugs mix, regardless of the temporal order of the
> exchange. The presence of guns—even, as here, unloaded guns which were only
> present for part of the exchange—during a drug transaction may increase the
> likelihood of violence erupting in what are often already volatile situations.
> Congress may have been concerned that the combined presence of firearms and
> drugs increases the likelihood of violence occurring, above the sum of the
> likelihood of violence in a drugs-only situation plus the likelihood of violence
> occurring in a guns-only situation. *See Smith v. United States*, 508 U.S. 223, 240,
> 113 S. Ct. 2050, 124 L. 2d. Ed. 138 (1993) ("When Congress enacted the [then]
> current version of § 924(c)(1), it was no doubt aware that drugs and guns are a
> dangerous combination."). . . .
>
> The logic undergirding 18 U.S.C. § 924(c) applies even where, as here, firearms
> are employed simply as a method of payment. Even when guns serve only as an
> instrumental function, that situation could easily change, should the drug deal go
> south. *See id.* ("The fact that a gun is treated momentarily as an item of
> commerce does not render it inert or deprive it of destructive capacity. Rather, as
> experience demonstrates, it can be converted *instantaneously from currency to
> cannon*."). Indeed, Congress amended 18 U.S.C. § 924(c) in 1998 for the specific
> purpose of expanding the statute to cover passive possession of a firearm in
> furtherance of a covered felony.

> In interpreting the "possession in furtherance" prong of 18 U.S.C. § 924(c), six of our sister circuits have reached the same conclusion as we did in *Doody*. *See United States v. Gardner*, 602 F.3d 97, 103 (2d Cir. 2010), *cert. denied*, ---- U.S. ----, 130 S. Ct. 3372, 176 L. Ed. 2d 1264 (2010); *United States v. Mahan*, 586 F.3d 1185, 1188 (9th Cir. 2009); *United States v. Dolliver*, 228 Fed. App'x. 2, 3 (1st Cir. 2007) (per curiam); *Luke-Sanchez*, 483 F.3d at 706; *United States v. Boyd*, 209 Fed. App'x. 285, 290 (4th Cir. 2006); *United States v. Frederick*, 406 F.3d 754, 764 (6th Cir. 2005); *see also United States v. Sterling*, 555 F.3d 452, 458 (5th Cir. 2009) (assuming without deciding that a guns-for-drugs exchange involves possession of a gun to further the sale of drugs). Along with our sister circuits, we consider bartering firearms for drugs, or vice versa, to be a sufficiently specific nexus between these two objects to constitute possession in furtherance of the drug sale.

*Dickerson*, 705 F.3d at 689–690 (emphasis added). In other words, mixing guns with drugs inherently increases a situation's volatility and, as a result, danger. Moreover, it can do so "instantaneously." Ultimately, neither Defendant's swift arrest nor the government's sting operation prevented the Court from concluding that Defendant possessed a firearm in furtherance of a drug trafficking crime, in violation of § 924(c). [2]

### B. The Evidence was Sufficient to Sustain Defendant's Guilty Verdict for Count Nine

#### 1. Constructive Possession Liability

The Court ultimately found Defendant guilty of Count Nine. Defendant, however, now argues that the "government's theory of constructive possession was factually flawed and cannot be the basis for Mr. Jones's conviction on Count Nine." (R. 332 at 5.) As a result, Defendant concludes, the evidence did not support Defendant's conviction under 18 U.S.C. § 924(c). (*Id.* at 3.) Viewing the evidence in the light most favorable to the government, however, the Court disagrees.

To prove Defendant guilty of Count Nine, the government had to prove the following beyond a reasonable doubt: that Defendant 1) committed the crime of distribution as charged in

---

[2] The Court details the evidence and "constructive possession" liability under Count Nine below.

Count Eight of the Indictment; 2) knowingly possessed a firearm; and 3) possessed the firearm in furtherance of the distribution of cocaine. *See United States v. Huddleston*, 593 F.3d 596, 602 (7th Cir. 2010) (citing *United States v. Duran*, 407 F.3d 828, 840 (7th Cir. 2005)). In all, the government presented law enforcement testimony, civilian testimony, undercover videos and photographs, recorded phone calls[3], stored text messages, and other physical evidence. Considering this evidence in the aggregate and in the light most favorable to the government, the Court finds that the government established each of these elements beyond a reasonable doubt.

First, the government presented a series of undercover photographs and videos and credible testimony from Agent Labno who dealt with Defendant as an undercover firearms and drug dealer. In one such video, Defendant explicitly communicated his desire to acquire firearms to Agent Labno. Specifically, on January 15, 2014, Defendant looked at photos of firearms on Agent Labno's cell phone and expressed that he wanted "30 poppers" and "30 clips," referring to handguns capable of storing 30 rounds of ammunition in the magazine. This interaction was captured on videotape that the government introduced at trial. Notably, after doing so, Defendant added, "[b]ut when you call, when you call me, you know what I'm saying,

---

[3] Defendant also argues that "the government's case relied on circumstantial evidence that was not reliable, did not establish allowable circumstantial inferences, and resulted in impermissible speculation as opposed to permissible logical inferences" including "phone call analysis that did not distinguish between actual phone conversations versus attempted phone contacts." (R. 323 at 2–3.) Defendant, however, fails to develop this argument. Thus, Defendant has waived it. The Seventh Circuit has made clear that undeveloped and merely perfunctory arguments like this are waived. *See United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) (finding that arguments "without discussion or citation to pertinent legal authority" in opening brief were waived); *see also United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011) (finding the argument was "decidedly underdeveloped and therefore waived"); *United States v. Foster*, 652 F.3d 776, 792 (7th Cir. 2011) ("As we have said numerous times, undeveloped arguments are deemed waived[.]") (internal quotation marks and citation omitted); *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) ("Merely reciting the Rule 59(a) standard and then tossing the motion into the court's lap is not enough. Failure to adequately present an issue to the district court waives the issue on appeal."). Further, this argument fails on the merits, as these telephone records were a small part of a plethora of evidence establishing Defendant's guilt. Indeed, these records simply served as circumstantial evidence that corroborated the witness testimony and physical evidence the Court also reviewed.

don't talk about no gun." From the beginning, Defendant was deceptive about his attempt to obtain firearms, displaying his knowledge and understanding of the deal's illegality.

Later, on February 4, 2014, Defendant further inquired about the drugs-for-guns transaction. Here, Defendant explicitly named which gun he desired and agreed on a drug-amount he would pay. Indeed, Defendant asked "[w]hat [does Agent Labno's "source"] want for that, um, that Glock with the extended clip right now?" Agent Labno responded, "[h]e'd probably want, like, I'd say, like, 450 [dollars]." Agent Labno also suggested another form of payment to Defendant, adding "[m]aybe six of them things, six jabs, and then do it that way[.]" Importantly, Defendant understood and agreed, responding "[y]eah." Moreover, Defendant then agreed to pay twelve jabs for two guns. Specifically, Defendant stated to Agent Labno that he wanted "[t]he one with the extended clip [the Glock] and the Beretta." Agent Labno and others testified that the term "jabs" referred to individual, pre-packaged hits of cocaine. In addition, on February 26, 2014, the undercover videos and photos portray both Defendant and Mr. Fields—who Defendant would ultimately send to the transaction on his behalf, as described below—looking at photos of firearms on Agent Labno's cell phone while Defendant further discussed the deal.

On two more occasions, Defendant confirmed to Agent Labno that he was still interested in engaging in the drugs-for-guns transaction. On March 19, 2014, Agent Labno asked Defendant "you still good for like them, like six on each?," referring to the six jabs of cocaine. Defendant responded, "[y]ea." Furthermore, after Agent Labno told Defendant that he had the Glock and the Beretta, among other firearms, Defendant assured Agent Labno, "I got you." Then, on March 25, 2014—the day before the charged transaction—Agent Labno asked Defendant "[y]ou cool on the six, the six things for each one, right?," again referring to the six

jabs of cocaine. Defendant again confirms, "[y]eah, the six, yeah." That day, however, Defendant lacked the drugs to purchase the guns, informing Agent Labno that he "ain't even got none right now, though." As a result, the exchange took place the next day.

On March 26, 2014, Mr. Fields testified[4] that he reported to Defendant's apartment and received six jabs of cocaine and four hundred and thirty dollars cash from Defendant. According to Mr. Fields, Defendant instructed him to take the drugs and money to the transaction with Agent Labno and get Defendant the "30 popper," referring to the Glock. Defendant chose not to attend the transaction in person. Indeed, the Confidential Informant ("CI"), working with Agent Labno, texted Defendant, "I'm on my way with that 30, so I wanted to know you were ready. I [sic] bringing all of them." Defendant replied, "[y]eah, but I can't come get it. You got to bring it." The CI then texted Defendant "I'll call you," and Defendant retorted, "[j]ust text only." Defendant again intended to be illusive. Ultimately, as noted above, Defendant sent Mr. Fields in his place, texting the CI, "[a]ll right. Um, um . . . send him for mines, too." The CI responded, "[a]ll right. I'll hit him then. Remember, 6 J hard for it," again, referring to the six jabs of cocaine. The evidence illustrates that the deal was clear to Defendant, Agent Labno, and the CI: Defendant would send an affiliate to Agent Labno and the CI with drugs and money to purchase two handguns, including, specifically, six jabs of cocaine for a Glock. The evidence introduced at trial fully corroborated these events.

Later the same day, Agent Labno testified that Mr. Fields, among others, arrived at an ATF warehouse and conducted the drugs-for-guns transaction. Surveillance video and

---

[4] As noted in the Court's verdict, the Court is aware that Mr. Fields has not been credible in the past. The Court further acknowledges that Mr. Fields is cooperating with the government pursuant to an agreement in which he hopes to receive a lower sentence. Moreover, the Court is fully aware that Mr. Fields has previously lied to this Court in particular. As a result, the Court considered his testimony with great caution and care. Nevertheless, as the Court also noted in its verdict, the plethora of undercover videos, undercover photographs, text messages, and recorded phone calls, standing alone, establish beyond a reasonable doubt that Defendant was guilty of Count Nine. Additionally, the evidence corroborated Mr. Field's testimony.

photographs captured the deal and corroborated Agent Labno's testimony. Specifically, Mr. Fields gave Agent Labno the six jabs of cocaine and cash he received from Defendant, and received the Glock and Beretta in exchange. The parties stipulated that the six jabs amounted to just over eight grams of mixtures and substances containing cocaine base in the form of crack cocaine. Significantly, the six jabs of cocaine and Glock were consistent with the exact specifics Defendant, Agent Labno, and the CI discussed over numerous communications in person and via telephone and text as described in detail above. Further, the amount of cash Defendant gave Mr. Fields matches the cash estimate that Agent Labno communicated to Defendant back in January and February, further illustrating Defendant's understanding of the deal.

Immediately after the transaction, law enforcement arrested Mr. Fields and his associates. Defendant's text communications with the CI that followed shed more light on Defendant's knowledge of the drugs-for-guns deal. Indeed, shortly after the officers arrested Mr. Fields, the CI informed Defendant, who was unaware of the arrest, that he was headed back to the "crib." Defendant responded, "[w]hat they . . . I'm trying to . . . I was trying to call my little shorties, man. They bumped up with you already?" Here, Defendant was referring to Mr. Fields, asking the CI whether Defendant's affiliates successfully exchanged with him. Telephone records corroborate this text conversation, illustrating Defendant's repeated unsuccessful attempts to contact Mr. Fields before texting with the CI. The CI then texted Defendant "[y]ou said that you were going to look out for me, man," referring to his desire to receive a cut from Defendant for helping set up the drugs-for-guns deal. Defendant replied, "[d]on't worry about it, man," demonstrating his intent to reward the CI for establishing his connection with the firearms. Both Defendant's repeated telephonic and text communications after Mr. Fields was arrested and his

reassurance to the CI further illustrate Defendant's knowledge of and involvement in the drugs-for-guns transaction.

In all, the evidence abundantly supported each of Count Nine's elements and, consequently, Defendant's guilty verdict. Defendant's argument to the contrary is unavailing. Specifically, Defendant asserts that "[b]ecause one gun was purchased with drugs and one gun was purchased with cash, and Fields's testimony made clear he did not know how he purchased each gun, Fields's testimony failed to prove that he (Fields) constructively possessed a firearm for Mr. Jones that furthered a drug trafficking offense." (R. 332 at 5.) The Court disagrees.

As the Court noted in its verdict, over two months' worth of evidence portrays that the deal was clear dating back to Defendant's discussions with Agent Labno in January. Defendant agreed to exchange drugs and money for two handguns including, specifically, six jabs of cocaine for a Glock. Using Mr. Fields to execute said deal, this is exactly what Defendant did, in violation of § 924(c). *Griffin* is informative:

> Constructive possession is a legal fiction whereby a person is deemed to possess contraband even when he does not actually have immediate, physical control of the object. *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009). Although constructive possession is a legal fiction, it can lead to real convictions and punishments. Constructive possession may be established by demonstrating that the defendant knowingly had both the power and the intention to exercise dominion and control over the object, either directly or through others. *United States v. Katz*, 582 F.3d 749, 752 (7th Cir. 2009).

*United States v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012) (emphasis added). Contrary to Defendant's assertion otherwise, Mr. Fields's ignorance of the deal's specifics does not preclude Defendant from constructively possessing a firearm in furtherance of a drug trafficking crime. Mr. Fields was a middle man in Defendant's drug operation. It is not surprising that he did not know the specifics. What *Defendant* knew, however, was that he gave six jabs of cocaine to Mr.

Fields so he could exchange them for a Glock for Defendant. Mr. Fields did just that. Indeed, he, presumably, would have returned that Glock to Defendant had the agents not arrested him. As such, the evidence sufficiently supported the elements under Count Nine, and Defendant's guilty verdict, regardless of what Mr. Fields did or did not know. Accordingly, Defendant's motion for acquittal or a new trial is denied as to Count Nine.

### 2.   Aiding and Abetting Liability

In the alternative, the evidence, when considered in the light most favorable to the government, was sufficient to support Defendant's guilty verdict under an aiding and abetting theory of liability. "[A] person aids and abets a crime when (in addition to taking the requisite act) he intends to facilitate that offense's commission." *Rosemond v. United States*, 134 S. Ct. 1240, 1248, 188 L. Ed. 2d 248 (2014) (citation omitted). Regarding the necessary intent, the Supreme Court has noted,

> An active participant in a drug transaction has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun. In such a case, the accomplice has decided to join in the criminal venture, and share in its benefits, with full awareness of its scope—that the plan calls not just for a drug sale, but for an armed one. In doing so, he has chosen . . . to align himself with the illegal scheme in its entirety—including its use of a firearm. And he has determined . . . to do what he can to make that scheme succeed. He thus becomes responsible, in the typical way of aiders and abettors, for the conduct of others. He may not have brought the gun to the drug deal himself, but because he took part in the deal knowing a confederate would do so, he intended the commission of a § 924(c) offense—*i.e.*, and armed drug sale.

*Rosemond*, 134 S. Ct. at 1249 (citations and quotation marks omitted).

As the Court noted in its verdict, Defendant and Mr. Fields both knew that Mr. Fields was taking six jabs of cocaine to a drugs-for-guns exchange where Agent Labno and the CI would provide a Glock and Berretta. Indeed, they "may not have brought the gun to the drug deal," but they both "took part in the deal knowing a confederate would do so[.]" *Id*.

Defendant's argument to the contrary is unpersuasive. Specifically, Defendant contends that "Mr. Jones never *knew* 'in advance' that Mr. Fields possessed a firearm in furtherance of a drug trafficking offense. Accepting the government's evidence at face value, at best, Mr. Jones *hoped* that Mr. Fields would possess a firearm after Fields exchanged crack cocaine for a firearm." (R. 332 at 7.) Defendant, however, misreads *Rosemond*. To possess the requisite intent, an aider and abettor need not know in advance that a confederate actually possessed the firearm, as Defendant contends. Instead, Defendant simply "had to have advance knowledge . . . that a confederate *would be* armed" before taking actions to advance the crime. *Rosemond*, 134 S. Ct. at 1252 (emphasis added). Here, that is exactly what happened. Defendant knew that the drug transaction involved firearms and, specifically, that Mr. Fields *would be* armed upon exchanging six jabs of cocaine for a Glock. Armed with that knowledge, Defendant still delivered the cocaine to Mr. Fields to advance the exchange. The facts do not, for example, support a scenario in which the defendant "first learned of the gun when it was fired" or brandished in the exchange, in which case the defendant could have refused to take any "further action to advance the crime." *Id.* Instead, Defendant had advance knowledge that a gun would be present at the drugs-for-gun exchange and still acted to advance the deal. In fact, Defendant set up the exchange so that he could get the firearm. Thus, the evidence more than supports Defendant's guilt under Count Nine under both a constructive possession and aiding and abetting theory of liability.

Defendant also argues that the government abandoned its "aiding and abetting liability" theory before trial "only to revive it after Mr. Field's testimony failed to establish third-person constructive possession liability." "This post-testimony change by the government," Defendant concludes, "prejudiced Mr. Jones's defense." (R. 332 at 6.) This argument is unavailing. The

government successfully established third-party constructive possession liability, as described in detail above.  Moreover, as Defendant notes, the government, in its initial proposed jury instructions, put Defendant on notice that it was entertaining an aiding and abetting theory of liability well before Mr. Fields's testimony, let alone post-trial.  (*See* R. 135, Gov. Prop. Jury Inst.)  Notably, Defendant objected to this theory of liability and proposed new instructions.  (R. 251.)  In light of Defendant's notice of both the constructive possession and aiding and abetting theories, Defendant has failed to demonstrate that he was prejudiced in any way.  Additionally, the Court found Defendant guilty under both the constructive possession and aiding and abetting theories of liability.  Defendant has failed to identify any error that warrants an acquittal or new trial.

## II.     **Kensha Barlow's Identifications were Credible and Properly Admitted**

Next, Defendant "renews and reasserts those arguments that he previously raised as to the photospread and subsequent in-person identification of Mr. Jones made by Kensha Barlow."  (R. 332 at 8.)  Specifically, Defendant contends that the Court should have suppressed Mr. Barlow's identification of Defendant as the man who shot him.  The Court, however, rejected these arguments in a written opinion on September 24, 2015 after a hearing in which the Court assessed the credibility of the relevant law enforcement personnel and Kensha Barlow.  (R. 229.)  Specifically, the Court found that law enforcement did not use any suggestive and unnecessary procedures.  (*Id*. at 12.)  As such, the Court concluded that there simply was not a very substantial likelihood of irreparable misidentification.  (*Id*.)  The Court incorporates this prior ruling herein.  In addition, after a second opportunity to assess the relevant witnesses during the trial, the Court concluded the same.  Collectively, the officers responsible for the photo lineups

had decades of experience and had conducted thousands of interviews and lineups. Further, their testimony corroborated Mr. Barlow's regarding the lineup procedures and events.

Defendant has not presented any new evidence that convinces the Court to now hold otherwise. Indeed, Defendant's argument that the government's failure to "preserve the photographs that were presented to Mr. Barlow at the time of the identification itself," in addition to the previously litigated errors, should now "compel" suppression is unconvincing. The evidence that *was* available and vetted throughout the trial did not illustrate any suggestive or unnecessary identification procedures. As a result, Kensha Barlow's identification testimony was credible and properly admitted at trial.

## III. The Evidence was Sufficient to Sustain Defendant's Guilty Verdict for Counts Ten Eleven, and Twelve

Finally, the Court found Defendant guilty of Counts Ten, Eleven, and Twelve in connection with his attempt to murder the CI after law enforcement disrupted the drugs-for-guns transaction with Mr. Fields. These charges pertain to two separate shootings at 454 North Austin Boulevard in Oak Park, Illinois—one on March 27, 2014 and one on April 2, 2014. The evidence demonstrated that both Kensha Barlow and the CI resided at this address. Mr. Barlow was shot on March 27 and the CI was shot on April 2. The government argued—and the evidence established—that Defendant mistakenly shot Mr. Barlow through his apartment door on March 27 because he thought the CI lived in that apartment unit. When he realized his mistake, Defendant Kelsey Jones went back to the building on April 2 and shot the CI.

Defendant argues that, "there is absolutely no evidence to conclude that Kelsey Jones and Toby Jones agreed to retaliate against anyone for providing information to law enforcement as is required for a conviction under Count Ten." (R. 332 at 9.) Additionally, Defendant maintains that "[b]ecause there was insufficient evidence to establish beyond a reasonable doubt that the

shooter of Kensha Barlow was Toby Jones, the convictions for Counts Eleven and Twelve should be dismissed." (*Id*. at 10.) The Court disagrees.

Count Ten charged Defendant with conspiring with his co-defendant, Kelsey Jones, to kill and attempt to kill another person and to knowingly cause bodily injury to another person, with the intent to retaliate against any person for providing to a law enforcement officer information regarding the commission and possible commission of a federal offense, in violation of 18 U.S.C. § 1513. (R. 216, the Indictment, at 10.) On January 13, 2016, the Court, in a detailed ruling, illustrated the abundant evidence supporting Defendant's conspiratorial agreement with Kelsey Jones to shoot the CI on March 27, 2014. (R. 282.) This evidence included, in part, Defendant's relationship with the CI; the narcotics conspiracy among Defendant, Kelsey Jones, and Mr. Fields; Mr. Fields's arrest at the drugs-for-guns exchange; Mr. Barlow's testimony regarding the March 27 shooting including his physical description of the shooters that, ultimately, matched Defendant and Kelsey Jones; the CI's testimony regarding the April 2 shooting; and all relevant telephone records surrounding the time of the shooting. Since then, the Court admitted and carefully reviewed this evidence throughout the trial.

Specifically, the evidence illustrated that Defendants had a relationship with the CI before he was shot on April 2, 2014. Indeed, the CI introduced Agent Labno to Defendants and helped them arrange the drugs-for-guns exchange. After law enforcement arrested Mr. Fields at this transaction, Defendant repeatedly attempted to contact the CI, as the Court described in detail above. At around midnight that evening, according to Mr. Barlow's testimony, two men shot him through his apartment door after demanding, "[i]t's me. . . . Open the fucking door." Mr. Barlow testified that he had never seen these two men before, suggesting that the shooter was at the wrong apartment unit. As described in further detail below, Mr. Barlow described

seeing the two men through his peephole and, eventually, gave a physical description that matched Defendant and his co-defendant, Kelsey Jones. Moreover, Mr. Barlow credibly identified Defendant in the courtroom as one of the men that shot him on the evening of March 27. Later, according to Lemar "Marty" Smith, the CI's neighbor at 464 N. Austin Boulevard and one of the defendants' drug customers, Kelsey Jones requested Mr. Smith meet with them at Defendant's 653 North Austin Boulevard apartment. Mr. Smith testified that Defendant and Kelsey Jones were both at the meeting, and Kelsey Jones inquired about the CI's location and car and, ultimately, asked Mr. Smith to report back to him or Defendant if he saw the CI. According to the CI, Mr. Smith contacted him some time after this meeting and warned him that Defendant and Kelsey Jones were looking for him. On the evening of April 2, 2014, Mr. Smith testified that Kelsey Jones also called him asking whether there were any cameras in 464 North Austin Boulevard's back parking lot. Shortly afterward, the evidence established that Kelsey Jones, with co-defendant Mario Whitfield driving the driving the get-away vehicle, shot the CI and his brother in the back parking lot. Telephone records and the CI's testimony corroborated this set of events. In sum, this evidence more than supported Count Ten's conspiratorial agreement between Defendant and Kelsey Jones to shoot and kill the CI. As a result, the evidence established Defendant's guilt under Count Ten of the Indictment, and Defendant has presented no new evidence for the Court to conclude differently.

The evidence also established Defendant's guilt for Counts Eleven and Twelve. Together, these Counts pertain, in large part, to the shooting of Kensha Barlow in a case of mistaken identity on March 27, 2014 at his 464 North Austin Boulevard apartment. As detailed above, the evidence revealed that Defendant mistakenly thought that the CI—not Mr. Barlow— lived there. Importantly, the CI testified that he also lived at this address. Further, the shooting

took place only hours after Defendant learned that law enforcement had arrested Mr. Fields in connection with Defendant's anticipated drugs-for-guns exchange that the CI helped orchestrate. According to Defendant's telephone records, Defendant attempted to reach the CI numerous times before the shooting that evening and, eventually, lost contact with him before the shooting occurred.

At trial, Mr. Barlow detailed the events surrounding his shooting.[5]  At around midnight that evening, Mr. Barlow returned to his apartment from a night out with his father and others. Upon entering his apartment, he heard loud, repeated banging at his door.  Initially, Mr. Barlow peered out of his peephole to see who it was, but someone had their fingers covering the other side.  Moments later, Mr. Barlow looked through the peephole again and was able to do so twice, each for a few seconds.  Below, the Court details what Mr. Barlow observed through the peephole.  Importantly, Mr. Barlow testified that he was able to see clearly through the peephole that evening.  The hallway was well lit, nothing obstructed his view, and his vision was not impaired.  He also noted that he was highly alert given the traumatic experience of hearing someone bang on his door at midnight and seeing them appear to reach for a gun.

Mr. Barlow's testimony is consistent with the Court's observations of the apartment and peephole.  Upon Defendant's request, the Court went to 464 North Austin Boulevard and looked through the same peephole at Apartment 202, where Mr. Barlow was shot.  The parties stipulated that the peephole and hallway were in the same shape they were in at the time of the shooting.

---

[5] The Court acknowledges that Mr. Barlow admitted to drinking a few beers and smoking marijuana the evening he was shot.  Further, the Court notes that Mr. Barlow admitted that he was still a little high from the marijuana when he was shot.  Accordingly, the Court considered his testimony very carefully.  Mr. Barlow also testified, however, that he stopped drinking at around nine that evening—approximately three hours before the shooting.  In addition, at the time of trial, Mr. Barlow had criminal charges against him pending before Judge Pallmeyer of the Northern District of Illinois.  Although he did not have a cooperation agreement with the government, the Court is mindful that Mr. Barlow hoped to receive some reduction in his sentence based on his cooperation in this case.  As such, the Court viewed his testimony with caution and great care.

The Court attempted to look through the peephole just as Mr. Barlow described in his testimony—quick glances lasting for only a few seconds each. Additionally, the parties agreed to stand in front of the door for the Court to determine whether it could make out any physical characteristics through the peephole. Ultimately, the peephole did not obstruct the Court's ability to see through it in any way. Nothing distorted the Court's view. Indeed, even with just a quick glance, the Court was able to make out the facial features, skin color, physical build, and identity of each person who stood on the other side of the peephole. This corroborated Mr. Barlow's consistent testimony from the suppression hearing and trial that he was able to see the men standing in front of his door when he was shot.

Mr. Barlow also heard the shooter make statements that further establish that Defendant's actions represent a case of mistaken identity. Specifically, as noted above, Mr. Barlow testified that he heard the shooter say "It's me. . . . Open the fucking door." Given that Mr. Barlow testified that he did not recognize the men and had never met Defendant, this sense of familiarity supported that he was likely not the shooter's intended target. Soon afterward, Mr. Barlow heard shots ring out. At least one of the bullets struck Mr. Barlow's leg.

Ultimately, Mr. Barlow's testimony regarding what he saw through the peephole was credible. Mr. Barlow identified Defendant as the man who shot him on the evening of March 27, 2014 on at least five separate occasions. Initially, Mr. Barlow twice gave an inaccurate physical description while he was at the hospital immediately after he was shot. Then, on or around April 2, 2014, however, Defendant identified Defendant as his shooter while reviewing a photo lineup with Agent Taylor of the Oak Park Police Department. He did so by pausing on Defendant's photo without saying anything. Indeed, Mr. Barlow scanned the photo lineup twice and, both times, he paused on Defendant's photo. Importantly, he did so despite testifying that he had

never seen or met Defendant before the night of his shooting. Officer Taylor's credible testimony corroborated this account. Specifically, Officer Taylor, a highly experienced Oak Park police officer with extensive photo lineup experience, recounted both times Mr. Barlow paused on Defendant's photo. This behavior, he said, stood out based on his experience. Moreover, Mr. Barlow confirmed to Officer Taylor that he recognized Defendant, but he did not want to get involved. Indeed, Mr. Barlow credibly testified at trial that he did not want to be considered a "snitch." Mr. Barlow admitted that he was a drug dealer, and this title would harm his business in the drug trade. Further, Mr. Barlow testified that he was concerned about his safety and thought it would be better to stay quiet. This testimony explained Mr. Barlow's inaccurate descriptions at the hospital immediately after the shooting and his refusal to vocalize anything to Officer Taylor a few days later.

Afterward, on June 2, 2014, Agent Labno arrested Mr. Barlow for drug activity unrelated to this case. During his interview with Agent Labno, Mr. Barlow vocally identified Defendant as the man who shot him using a photospread. For the reasons the Court detailed in its September 24, 2015 opinion denying Defendant's suppression motion, the Court finds that Agent Labno's June 2 photo lineup procedures were neither suggestive nor unnecessary. Later, on June 17, 2014, during an interview with ATF Special Agent Tony Heiserman, Mr. Barlow backtracked, stating that he was forty percent sure that Defendant was the shooter. Agent Heiserman, who testified credibly during the September 2014 suppression hearing, corroborated Mr. Barlow's testimony.

Subsequently, the government subpoenaed Mr. Barlow to testify before the grand jury. Before testifying before the grand jury, Mr. Barlow admitted to law enforcement that he had lied to Agent Heiserman on June 17 when he said he was uncertain about his June 2 identification—

he was not forty percent sure, but one hundred percent sure that Defendant was the shooter. Further, he admitted to them that he had always been sure of this fact, but he did want to endanger himself or his family by "snitching." Ultimately, according to Mr. Barlow, he was sure Defendant was the shooter. Mr. Barlow also testified to these facts before this Court during both the suppression hearing and trial. Moreover, Agent Heiserman's and Agent Labno's testimony corroborated Mr. Barlow's explanation for his inconsistent testimony. In front of the grand jury, Mr. Barlow's testimony matched his June 2 statement to Agent Labno—Defendant was the man he saw through the peephole just before he was shot. Finally, Mr. Barlow testified credibly and consistently twice before this Court during both the suppression hearing and trial. Indeed, he correctly identified Defendant in the courtroom as the man he saw on the night of March 27, 2014. Mr. Barlow stated that he was "one thousand percent sure" that the Defendant was the person who shot him.

In conclusion, the evidence, when considered in the light most favorable to the government, amply supported the conviction on both Counts Eleven and Twelve and, as a result, Defendant's guilty verdict. As a result, the evidence does not "preponderate heavily against the verdict[.]" *Swan*, 486 F.3d at 266. Thus, Defendant's motion seeking an acquittal and/or new trial under Rules 29 and 33, respectively, is denied.

**CONCLUSION**

For the foregoing reasons, the Court denies Defendant's post-trial motions for acquittal and a new trial under Federal Rules of Criminal Procedure 29 and 33.

**DATED:  May 9, 2016**                                        **ENTERED**

_____
AMY J. ST. EVE
United States District Court Judge